IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LINK SNACKS, INC., L.S.I., INC. - NEW GLARUS,
LINK SNACKS GLOBAL, INC., NORTHERN AIR
SERVICES, INC., LINK HOLDINGS, INC.,
JOHN E. LINK, TROY J. LINK, JOHN HERMEIER,
LAWRENCE J. JARVELA, and MICHAEL McDONALD,

OPINION and ORDER

08-cv-714-slc

Plaintiffs,

v.

FEDERAL INSURANCE COMPANY,

Defendant.

Both sides have moved for summary judgment in this insurance coverage lawsuit.  For the reasons stated below, I am denying defendant's motion and granting summary judgment in favor of plaintiffs.

This federal lawsuit arises out of a state lawsuit between the plaintiffs and Jay Link over the control of Link Snacks, Inc. and affiliated companies.  John Link (called "Jack" by the parties) is the chief executive officer for the company.  Jay Link is John's oldest son; Jay left the company in 2005 after several years of acrimony with members of his family.  Lawsuits followed.  Link Snacks, Inc., Jack Link and Troy Link struck first, filing a lawsuit against Jay Link in Wisconsin state court in September 2005, primarily seeking declaratory relief regarding Jay's rights in the company.  Two months later, Jay filed counterclaims against each of the plaintiffs on a number of grounds, including breach of fiduciary duty, defamation and misrepresentation.

Plaintiffs asked defendant Federal Insurance Company to defend them against Jay's claims under Link Snacks directors and officers insurance policy.  Defendant declined to do so on the ground that the policy did not cover this dispute.  So plaintiffs hired their own lawyers,

and went to trial.  The jury returned a mixed verdict, awarding Jay $736,000 in compensatory damages and $5 million in punitive damages (reduced to $736,000 by the trial judge), but also awarding $5 million in punitive damages to plaintiffs against Jay (later reduced to one dollar).

*This* lawsuit followed, filed in state court by plaintiffs and removed to federal court by defendant.  Plaintiffs alleges breach of contract by defendant and seek recompense of the costs they incurred defending and losing the state court trial.  There is federal diversity jurisdiction under 28 U.S.C. § 1332(a)(1).[1]  The parties agree that Wisconsin law applies to their dispute. *RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008)("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.")

Now before the court are the parties' cross motions for summary judgment. *See* dkts. 41 & 46.  Defendant asserts that its refusal to defend plaintiffs is justified because Jay Link was not suing plaintiffs under a legal theory of  "wrongful termination," which is the only kind of claim that the policy covered in cases in which a company executive is suing the company or other executives.  Alternatively, defendant argues that the policy did not provide coverage because plaintiffs failed to disclose any facts about their dispute with Jay when they applied for insurance in May and June 2005, even though the application for the insurance policy required them to disclose facts that they had "reason to suppose might give rise to any claim that would fall within the scope of any of the proposed coverages."

_____

[1] Defendant is a citizen of Indiana (its state of incorporation) and New Jersey (its principal place of business); plaintiffs are citizens of Wisconsin, except for Jack Link, who is a citizen of Florida, and Troy Link, who is a citizen of South Dakota.  Plaintiffs seek well over $ 75,000 in damages.

2

Plaintiffs respond that Jay Link's counterclaims triggered defendant's duty to defend because Jay *was* alleging that they had terminated him wrongfully, and that they could not have predicted this lawsuit even a few months earlier when they bought their policies. There is potential tension between these two positions: if Jay's claims (or more accurately, his counterclaims) were meritorious enough to support a seven-figure jury verdict, shouldn't plaintiffs have had reason in Spring 2005 to suppose that Jay might assert them?

Despite this possible tension, plaintiffs are entitled to summary judgment. First, Jay Link's counterclaims triggered defendant's duty to defend. It is clear from these counterclaims that Jay's breach of fiduciary duty claim was premised on allegations that he was wrongfully terminated from his position in the company. Defendant's attempt to limit the policy to a particular legal theory is inconsistent with both the policy's language and Wisconsin case law.

Second, I agree with plaintiffs that defendant has failed to show that Jay Link's allegations of wrongful termination were reasonably foreseeable at the time the insurance policy took effect. Although the relationship between Jay and plaintiffs was contentious, defendant's proposed findings of fact do not show that plaintiffs were forcing Jay out of the company or even that Jay believed that plaintiffs were doing so in June 2005. Rather, the facts show that *Jay* was threatening plaintiffs that he was going to leave the company voluntarily.

Neither side attempts to explain the jury's verdict in light of these facts. It may be that the jury found that some of the plaintiffs breached their fiduciary duty in a way unrelated to the allegations of wrongful termination or that evidence before the jury included additional facts not adduced by the parties in the case. In any event, this court is limited to the facts and issues raised by the parties in the context of their motions for summary judgment. Defendant does not

3

claim lack of duty to indemnify on the ground that the jury's verdict was premised on behavior other than wrongful termination.  Because the facts before this court show that the arguments defendant *does* raise fail as a matter of law, I am denying its motion for summary judgment and granting summary judgment in favor of plaintiffs.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed:

UNDISPUTED FACTS

## I.  The Conflict between Plaintiffs and Jay Link

Plaintiffs Link Snacks, Inc., L.S.I., Inc.-New Glarus, Link Snacks Global,. Inc. and Northern Air Services, Inc. are privately held companies located in Minong and New Glarus, Wisconsin and operating under the trade named "Jack Link's Beef Jerky."  Plaintiff Jack Link is the chief executive officer.  As early as 2002, conflict was simmering between Jack and his son Jay Link (the chief operating officer) arising out of  Jay's ambition to replace Jack as CEO.  In 2004, Link Snacks hired two advisors to help resolve the dispute.

In June 2004, plaintiff Lawrence Jarvela, (senior vice president of finance), assessed the situation in an email to plaintiff John Hermeier (chief financial officer):

> He [Jay] ranted about the same stuff and is threatening to leave. He is, in my opinion, intenti[on]ally doing things against Jack['s] will and tells people it will be his decision to do things. . . . Jay is on a real ego trip and if Jack would step aside we could be in real trouble.
>
> * * *
>
> Some of the things he said down here were disturbing like he cannot do anything as Jack will oppose him. I told him if he would discuss things with Jack ahead of Making [a] decision it would be better. He flat out said he will not do this.

4

> Between you and me if he is named CEO and Jack is put in some
> meaningless position I will recommend they sell the company.  Jay
> has some good qualities but he also has some very bad ones.
>
> * * *
>
> Anyway, it sounds like Jack will not go out quiet. . . . Jay said he
> is not going to compromise. The battle lines are being drawn.  We
> will have to see what will happen.  A lot of time being wasted but
> that will happen.

Plaintiff Michael McDonald (the president of plaintiff L.S.I., Inc—New Glarus in 2004 and early 2005) believed that Jay did not respect Jack, that Jay wanted Jack out of the company and that the conflict between Jack and Jay "was the most important issue we faced at that time."

In October 2004, Jack wrote a memo to Jay and his other son, plaintiff Troy Link, in which he stated that he is "reasserting [his] control over worldwide meatsnack operations."  At a December 2004 board of directors meeting, Jay stated that "he is not going anywhere and wants to be the CEO."  Jay and Jack planned to "meet and resolve the organization.  This is the highest priority of the company."  In January 2005, Jay again threatened to leave the company after Jack told him that he "would not be made CEO."

In early February 2005, the law firm Freeborn & Peters was retained by "Link Snacks, Inc., its affiliated businesses, Jack Link and Troy Link in connection with family and ownership planning matters as well as certain matters relating to LF Investments 2002."  Hermeier believed that Jay was excluded because "joint representation could potentially create a conflict down the road."

On February 11, 2005, Troy asked Jarvela to do a valuation of Jay's shares in response to Jay's threats to leave the company.  Troy wanted to know if the company had enough capital

to buy Jay out.  On March 25, Jarvela suggested to Jack and Troy that a challenge to the company's "Buy-Sell Agreement" may be necessary to give the company the right to purchase 100% of a departing shareholder's shares.

On May 5, 2005, Peter Mason, a lawyer from Freeborn & Peters, sent a memo to Jarvela, summarizing the "the general strategy" from a May 4 meeting between Jack, Troy, Jarvela and Mason.  The memo was labeled "Attorney Work Product" and included the following language:

> JAY: Terminate Jay's operational involvement with the business (see specifics below).
>
> * * *
>
> PROPOSAL TO JAY LINK: We discussed the following general proposal for restructuring the management of Link Snacks, Inc. and affiliated companies:
>
> > • Jay would leave all of the Link Snacks businesses as an employee and would not have any further role in the management of operation of these companies.
> >
> > • Jay would remain as a director of the newly restructured holding company, Link Snacks, Inc.
> >
> > • Jay would receive a severance package of approximately 2 years base pay and would remain on the company's benefits plans.
> >
> > • The company would modify its dividend policy to pay all shareholders their ratable share of income taxes . . .
> >
> > • Jay would be granted a one-time right to sell to the company any or all of Jay's shares (in the restructured company) within 12 months after his separation at an appraised value as determined by a major valuation firm such as Houlihan Lokey. . .

6

> • Jay would agree to the corporate restructuring
> along the lines suggested [we will have to detail
> this to him] and both Jay and the company would
> sign mutual releases.

On May 26, 2005, Jack wrote a letter to Jay that began, "As we discussed Saturday, I believe it is in the best interests of our family and the Link Snacks business for your role as an employee of Link Snacks, Inc. and affiliated companies to come to an end." The letter then listed several of the proposals, including:

> 1. You would cease to be an employee of the Link Snacks businesses and would not have any further role in the management or operation of these companies.
>
> 2. You would remain as a director of the newly restructured holding company, Link Snacks, Inc. so long as you continue to own 10% of the fully diluted equity in the company.
>
> * * *
>
> 4. You would receive a severance package of $750,000 per year for 2 years (payable according to the normal payroll arrangements) and would remain on the company's health and welfare benefit plans during the 2-year period and as long thereafter as you remain a director of the company.
>
> * * *
>
> 6. You would agree to the corporate restructuring set out below. The corporate restructuring would consist of the contribution by Troy and you of all your respective shares in the entities constituting Link Snacks, Inc. . . . in exchange for newly issued shares of Link Snacks, Inc. non-voting common stock, The number of non-voting shares to be issued to Troy and you would be determined by the relative value of each of the entities comprising the Link Snacks business. The newly issued non-voting shares of Link Snacks, Inc. will have all of the same characteristics as the existing Link Snacks shares, except for voting rights.
>
> * * *

7

8. You would be granted the one-time right to sell to the company <u>any or all</u> of your shares (in the restructured company) at an appraised value as determined by a major valuation firm such as Houlihan Lokey. . . .

9.  The company will work with you to craft an announcement of your change of position.

10. As part of this resolution you, Troy, the company and I would execute mutual releases as well as non-disparagement, noncompete and confidentiality agreements.

The letter closed by asking Jay Link to sign and return the document and offered, "If you or your attorneys have any questions about any aspect of this proposal, please feel free to contact Peter Mason, who can walk you through it in more detail."

On June 6, 2005, Jack, Jay and Troy met again but were unable to resolve their differences.

## II.  Plaintiffs' Insurance Policy with Defendant

In May  2005 plaintiff Link Snacks, Inc. began an application for an insurance policy with defendant Federal Insurance Company.   On June 9, 2005, defendant sent a form to plaintiffs requesting the following request for information:

The Applicant must complete the prior knowledge statement below:

\* \* \*

No person or entity proposed for coverage is aware of any fact, circumstance, or situation which he or she has reason to suppose might give rise to any claim that would fall within the scope of any of the proposed coverages for which the Applicant does not currently maintain insurance, or within any of the larger limits of liability sought by the Applicant, except: _____

8

In the blank, plaintiff Link Snacks wrote "None."

Directly below the blank was an advisory by defendant:

> Without prejudice to any other rights and remedies of the Company [defendant], the Applicant understands and agrees that if any such fact, circumstance, or situation exists, whether or not disclosed in response to this Question . . ., any claim or action arising from such fact, circumstance, or situation is excluded from coverage under the proposed policy, if issued by the Company.

The next section of the application included an instruction for supplementing answers:

> If there is any material change in the answers to the questions in this Application before the policy inception date, the Applicant must immediately notify the Company in writing, and any outstanding quotation may be modified or withdrawn.

Plaintiff John Hermeier, the chief financial officer for plaintiff Link Snacks, signed the application.

Defendant issued an insurance policy to plaintiff Link Snacks, with an effective date of June 14, 2005.  Plaintiffs Link Snacks, Inc., L.S.I., Inc., LSI, Inc.-New Glarus and Northern Air Services are named as "Insured Organizations" under the policy.   The policy included several provisions regarding the scope of coverage that are relevant to this case:

**I. INSURING CLAUSES**

* * *

**(B) Individual Indemnified Liability Coverage**

The Company shall pay Loss on behalf of the Insured Organization resulting from any D&O Claim first made against Insured Persons during the Policy Period, or any applicable Extended Reporting Period, for Wrongful Acts to the extent the Insured Organization indemnifies the Insured Persons for such Loss.

**(C) Corporate Liability Coverage (Optional)**

If the Corporate Liability Coverage is purchased as set forth in Item 3 of the Declarations of this Coverage Section, the Company shall pay Loss on behalf of the Insured Organization resulting from any Insured Organization Claim first made against such Insured Organization during the Policy Period, or any applicable Extended Reporting Period, for Wrongful Acts.

* * *

## II.  DEFINITIONS

(D) D&O Claim means:

(1) any of the following:

> (a) a written demand for monetary damages or nonmonetary relief;
>
> (b) a civil proceeding commenced by the service of a complaint or similar pleading;
>
> (c) a criminal proceeding commenced by a return of an indictment; or
>
> (d) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;
>
>  against an Insured Person for a Wrongful Act, including any appeal therefrom; or

(2) a formal civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by the Insured Person of a written notice from the investigating authority specifically identifying the Insured Person as a target individual against whom formal charges may be commenced; or

(3) a written request received by an Insured to toll or waive a statute of limitations, relating to a potential D&O Claim as described in paragraphs (1) and (2) above.

10

* * *

(F) Executive means any natural person specified below:

(1) duly elected or appointed directors, officers, members of the Board of Managers or management committee members of any Insured Organization incorporated in the United States of America;

* * *

(H) Insured means the Insured Organization and any Insured Person.

(I) Insured Organization Claim means:

(1) any of the following:

      (a) a written demand for monetary damages or nonmonetary relief;

      (b) a civil proceeding commenced by the service of a complaint or similar pleading;

      (c) a criminal proceeding commenced by a return of an indictment;

      against an Insured Organization for a Wrongful Act, including any appeal therefrom; or

(2) a written request received by an Insured Organization to toll or waive a statute of limitations, relating to a potential Insured Organization Claim as described in paragraph (1) above.

(J) Insured Person means any past, present or future Executive or Employee of the Insured Organization.

* * *

## III. EXCLUSIONS

(A) No coverage will be available under this Coverage Section for any Claim against an Insured:

* * *

11

(5) brought or maintained by or on behalf of any Insured in any capacity; provided that this Exclusion (A)(5) shall not apply to:

> (a) a Securityholder Derivative Demand or Securityholder Derivative Action;

> (b) a Claim brought or maintained by an Insured Person for contribution or indemnification, if such Claim directly results from another Claim covered under this Coverage Section;

> (c) a D&O Claim brought or maintained by Employees who are not past or present Executives of an Insured Organization if such D&O Claim is brought and maintained without the assistance, participation or solicitation of any such Executives;

> (d) a D&O Claim brought or maintained by an Executive for the actual or alleged wrongful termination of such Executive;

> (e) a Claim brought or maintained by an Executive who has not served as an Executive or the Insured Organization for at least four (4) years prior to the date such Claim is first made and who brings and maintains such Claim without the assistance, participation or solicitation of the Insured Organization or any Insured Person who: (I) is serving as an Executive of the Insured Organization; or (ii) has served as an Executive of the Insured Organization within such four (4) year period; or (f) a Claim brought and maintained in a jurisdiction outside the United States of America, Canada or Australia by an Insured Person of an Insured Organization chartered in such foreign jurisdiction;

In addition, the policy included a provision regarding defendant's duty to defend:

## IX.  DEFENSE AND SETTLEMENT

(A)      Solely with respect to any Liability Coverage Sections:

12

> (1)    The Company shall have the right and duty to defend any
> Claim covered by this Policy. Coverage shall apply even if
> any of the allegations are groundless, false or fraudulent.
> The Company's duty to defend any Claim shall cease upon
> exhaustion of the applicable Limit of Liability.

Under a section of the policy called "Notice of Loss Control Services," defendant informs plaintiffs that "we have valuable information available to you," including a publication called *Employment Practices Loss Prevention Guidelines*. The policy describes the guidelines as "an overview of key employment issues [that] offers proactive ideas for avoiding employment lawsuits." The guidelines include a section called, "Common Law Claims under State Law," which includes a discussion of "a number of recognized exceptions to the general employment-at-will rule." One of listed exceptions is "Wrongful Discharge / Discharge in Violation of Publication," but the guidelines state that "[t]he most common form of wrongful termination lawsuits alleges that an employer breached a contract" and that "[d]efamation claims often arise in connection with claims of wrongful termination."

## III. Litigation between Jay Link and Plaintiffs

On August 4, 2005 Jay and Jack signed a "departure memorandum" that established a "negotiation period" during which the "parties will meet on an expedited basis and agree to negotiate in good faith to arrive at a written framework and process that shall govern the Buy-out." According to the memorandum, "Jay will be terminated as an employee of Link Snacks, Inc. and its affiliated entities and all companies owned with Jack and/or Troy."

Apparently, negotiations failed: on September 23, 2005, plaintiffs Link Snacks, Inc., Jack Link and Troy Link filed a lawsuit against Jay Link in the Circuit Court for Washburn County,

13

Wisconsin.  They sought declarations regarding Jay's ownership in Link Snacks and the validity of the buy-sell agreement, the bylaws of plaintiff L.S.I., Inc.-New Glarus and a sale of shares from Jay to Troy that occurred on January 11, 2004.  In addition, plaintiffs asserted a claim for breach of fiduciary duty.

On November 7, 2005, Jay Link answered the complaint and filed counterclaims against not only Jack, Troy and Link Snacks, Inc, but also L.S.I., Inc.-New Glarus, Link Snacks Global, Inc., Northern Air Services, Inc., Link Holdings, Inc. John Hermeier, Lawrence Jarvela, Michael McDonald and Richard May.  Jay asserted counterclaims for misrepresentation, "unilateral mistake," "judicial dissolution," breach of fiduciary duty and defamation. In addition, he sought declarations that the non-compete provision in the buy-sell agreement was invalid.

Jay included the following allegations in his complaint:

- plaintiffs "schemed to drive him out and raid his interests in the various family-owned businesses";

- plaintiffs "forc[ed] Jay out an employment position";

- Troy "seized the opportunity to force his older brother out,"

- "Jack and Troy Link had, and continue to have, no intention of restructuring the Link Family Enterprise until Jay is forced out of the enterprise";

- "Jack took the next step to force his oldest son out of the Link Family Enterprise";

- "Jack and Troy set out to remove him permanently.  On May 26, 2005 . . . Jack Link . . sent Jay a letter informing him that he would be fired from all companies";

- "Jack Lin[k] maneuver[ed] to kick his oldest son out of the family business";

14

- "In the hopes of salvaging his family relationships and minimizing any disruption and damage to the Link Family Enterprise, Jay accepted termination without formal action by the board of directors";

- "Jack and Troy voted to . . . force Jay out";

- "Jack and Troy . . forced Jay out of the Link Family Enterprise."

Jay Link further alleged that "Jack Link, Troy Link, and the other directors of the Oppressing Link Companies . . . breached their fiduciary duties to Jay, as a shareholder in the Oppressing Link Companies" by engaging in the following conduct:

A. Insisting on Jay's termination from the Link Family Enterprise;

B. Refusing to consider Jay's counterproposal that would permit him to remain an officer in the Link Family Enterprise;

C. Upon information and belief, permitting non-Link employees such as Jim Liautaud, Lee Hausner and Peter Mason to dictate corporate action without authority of the board of directors or shareholders of the Oppressing Link Companies;

D. Falsely accusing Jay of stealing corporate property and threatening corporate employees;

E. Refusing to negotiate a resolution of the shareholder dispute in good faith;

F. Refusing to engage in board discussion either of Jay's termination or of Jay's counterproposal of continued employment;

G. Refusing Jay access to Link Snacks' premises to retrieve his personal records, as called for in the Departure Memorandum;

H. Instructing Jay's executive assistant to act in an insubordinate manner and requesting that she report back to Jack and Troy the details of Jay's actions;

15

I. Informing executive management of the Link Family Enterprise that Jay was mentally ill without any basis in fact and with an intent to undermine and damage Jay;

J. Prohibiting Jay from utilizing property owned by Northern Air, contrary to past corporate practice and despite the fact that Jay is a 40% shareholder in the company;

K. Inequitably treating Jay, a shareholder in all Link companies, by paying dividends to Jack and Troy Link in the form of excessive salary and fees while not paying Jay dividends commensurate with his ownership interest in the Link Family Enterprise; and

L. Wasting corporate resources, including using corporate resources for unjustified personal gain.

Plaintiffs gave defendant notice of Jay's counterclaims on or before January 19, 2006.[2] Defendant denied coverage in a letter dated March 6.  It did not defend plaintiffs, file a declaratory action to ascertain its obligations under the policy or proceed with a defense of the case under a reservation of rights.

In 2008 a Wisconsin jury found that Jack Link and Troy Link breached their fiduciary duty to Jay Link.  With respect to Troy, the jury awarded no damages; with respect to Jack, it awarded $736,000 in compensatory damages and $ 5,000,000 in punitive damages.  (The trial judge later reduced the punitive damages award to $ 736,000.)  The jury found that Link Snacks, Inc., John Hermeier, Larry Jarvela and Michael McDonald did *not* breach their fiduciary duties to Jay.  (The parties do not propose any facts regarding the resolution of Jay's claims against the remaining plaintiffs.)

---

[2]  Plaintiffs gave defendant notice of a second lawsuit that Jay filed against some of them in South Dakota in November 2005, but plaintiffs do not discuss that lawsuit in their complaint or in their briefs, so I assume that plaintiffs are not seeking compensation for expenses related to that lawsuit.

OPINION

## I.  Duty to Defend:  Wrongful Termination Provision

The parties agree that plaintiffs' insurance policy includes a duty to defend against any covered claims and that the policy excludes from coverage most claims brought by past or present executives against any of the Link Snacks companies or its other executives.   (The parties refer to this as the "Insured vs. Insured" exclusion.)  The dispute is over an exception to that exclusion for claims "brought or maintained by an Executive for the actual or alleged wrongful termination of such Executive."   Plaintiffs say that Jay Link's allegations in his counterclaims triggered that exception; defendant disagrees.[3]

Resolution of this dispute hinges on the meaning of "wrongful termination" in the context of the policy.  Defendant argues that the term is limited to claims that constitute the Wisconsin tort of wrongful discharge, which occurs when an employee is fired for fulfilling, or refusing to violate, a fundamental, well-defined public policy or an affirmative legal obligation established by existing law. *Bammert v. Don's Super Valu*, 2002 WI 85, ¶ 3, 254 Wis.2d 347, 646 N.W.2d 365.  Because Jay did not sue plaintiffs under that legal theory, defendant asserts that its duty to defend was not triggered.

Plaintiffs disagree, arguing that the ordinary meaning of the words control.  In other words, if the basis for a claim is that a party was terminated wrongfully, then the duty to defend is triggered.  Because at least some of Jay Link's claims were premised on allegations that

---

[3] Both sides have cited materials outside Jay Link's counterclaims to support their conflicting views, but I have disregarded them. *Eddy v. B.S.T.V., Inc.*, 280 Wis.2d 508, 511, 696 N.W.2d 265, 267 (Ct. App. 2005) ("When an insurance company disputes coverage and asserts that it has no duty to defend or indemnify the policy holder against certain claims, we are limited to the four corners of the complaint in determining whether there is coverage.")

plaintiffs wrongfully forced him out of the company, plaintiffs say that defendant should have represented them against Jay.

The general rule in interpreting insurance policies is to give a word "the common and ordinary meaning it would have in the mind of a reasonable lay person in the position of the insured." *Liebovich v. Minnesota Insurance Co.*, 2008 WI 75, ¶ 17, 310 Wis.2d 751, 766, 751 N.W.2d 764, 771. *See also State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 14, 275 Wis. 2d 35, 46, 683 N.W.2d 75, 81; *Folkman v. Quamme,* 2003 WI 116, ¶ 17, 264 Wis. 2d 617, 632, 665 N.W.2d 857, 865; *Kremers-Urban Co. v. American Employers Ins. Co.* 119 Wis. 2d 722, 735, 351 N.W.2d 156, 163 (1984). Nothing in the policy actually supports defendant's constringed definition of "wrongful termination." If defendant had wanted to limit the meaning of this term to a particular legal theory, then it could have–should have–done so by including this definition in the policy. Defendant cannot retroactively narrow the term's construction to fit its litigation strategy.

To the extent the policy includes affirmative evidence that supports either party, it supports plaintiffs. The policy cites with approval a publication called *Employment Practices Loss Prevention Guidelines*, which discusses a number of different legal theories that could fall under the rubric of "wrongful termination," including breach of contract and defamation as well as wrongful discharge. Although this is not robust proof, it provides some support for giving "wrongful termination" its ordinary meaning rather than limiting the term to a particular legal definition.

Defendant does not address the canon from *Liebovich* and it downplays the language from the guidelines. Instead, defendant emphasizes language from other opinions in which courts

18

have stated that "the allegations in the complaint must state a claim or cause of action for the liability insured against." *E.g., Atlantic Mutual Insurance Co. v. Badger Medical Supply Co.,* 191 Wis. 2d 229, 242, 528 N.W.2d 486, 491 (Ct. App. 1995). Defendant interprets this language to mean that it was not required to defend plaintiffs unless Jay Link's counterclaims stated a claim under a legal theory of "wrongful termination." There are several problems with this argument.

First, there is no specific claim called "wrongful termination" in Wisconsin. Defendant argues that the policy should be construed as referring to the tort of wrongful discharge but, again, the policy itself provides no support for such a reading. Alternatively, defendant argues that "wrongful termination" is simply another term for "wrongful discharge" under Wisconsin law. It cites *Emiabata v. Marten Transport, Ltd.*, 574 F. Supp. 2d 912, 918 (W.D. Wis. 2007), in which Judge Crabb used the words "wrongful termination" in the context of a discussion of a wrongful discharge claim.

Defendant's argument is not persuasive. The use of imprecise language in one case is not enough for defendant to establish that "wrongful discharge" and "wrongful termination" are interchangeable terms under Wisconsin law. Wisconsin case law and the pattern jury instructions consistently refer to the tort as one for wrongful discharge. WIS JI-CIVIL 2750, Employment Relations: Wrongful Discharge—Public Policy; *Bammert*, 2002 WI 85, *Batteries Plus, LLC v. Mohr*, 2001 WI 80, 244 Wis. 2d 559, 628 N.W.2d 364, *Helland v. Kurtis A. Froedtert Memorial Lutheran Hosp.*,229 Wis.2d 751, 601 N.W.2d 318 (Ct. App. 1999). In fact, the supreme court has suggested that the tort of wrongful discharge is simply *one kind* of wrongful termination. *Hausman v. St. Croix Care Center*, 214 Wis.2d 655, 670, 571 N.W.2d 393, 399 (1997) ("Absent application of the *wrongful discharge public policy exception*, such an individual has

19

no recourse to regain a former position or receive redress for a *wrongful termination*.) (emphasis added). This supports plaintiffs' view that the phrase "wrongful termination" is not tied and limited to any particular legal theory.

Second, the Court of Appeals for the Seventh Circuit has explained that the choice of legal theories in the complaint is not important in determining whether an insurance company has a duty to defend. Rather, the question is whether the "conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers." *Curtis-Universal, Inc. v. Sheboygan Emergency Medical Services, Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994) (applying Wisconsin law). *See also St. Paul Fire and Marine Ins. Co. v. Hausman*, 231 Wis. 2d 25, 31-32, 604 N.W.2d 908, 911-12 (Ct. App.1999) ("We determine whether insurance coverage exists by focusing on the incident itself and not the theory of liability."). Thus, cases like *Atlantic Mutual* are best read to mean that the plaintiff must state a claim under *some* theory of liability, but it does not matter which theory that is, so long as the *facts* alleged in support of that claim fall within the scope of coverage.

This view is supported by *C.L. by Guerin v. School Dist. of Menomonee Falls*, 221 Wis. 2d 692, 702-703, 585 N.W.2d 826, 830 (Ct. App. 1998), in which the court concluded that an insurance company was not obligated to defend an insured against a claim labeled "negligence" in the complaint, even though the policy covered negligent conduct. Because the *facts* alleged involved sexual abuse (which is intentional conduct by definition), the complaint did not state a claim that would be covered by the policy. The legal theory denominated in the complaint was irrelevant. It follows that if the "correct" legal theory is not enough to save a claim when the facts alleged do not fall within the scope of coverage, then the "wrong" legal theory should not

defeat a claim when the facts alleged *do* fall within the scope of coverage. If it were this easy for insurers to avoid their duty to defend and indemnify, then plaintiffs would merrily spark calculated discord between defendants and their insurers by picking odd terms to characterize their causes of action.

It should not surprise defendant that it needed to include an express limitation regarding the meaning "wrongful termination" in its policy if that is what it intended. As plaintiffs point out, defendant took a similar tack several years ago in *Walz v. Federal Ins. Co.*, No. 04 C 2286, 2004 WL 2452713, *5 (Oct. 29, N.D. Ill. 2004), when it argued that the "wrongful termination" clause did not cover an allegation that the insured had "improperly removed" an executive because the executive brought a claim for tortious interference with a contract rather than a claim for "wrongful termination." In *Walz*, the court rejected defendant's argument on the ground that defendant was focusing incorrectly on the legal theory rather than the facts alleged. I agree with the court's analysis and holding in *Walz*, so it is unnecessary to consider plaintiff's claim preclusion argument on this point.

Defendant cites a number of cases in which courts compared the elements of the claim asserted in the complaint against the elements of a claim covered by the policy. *E.g., Atlantic Mutual,* 191 Wis. 2d at 241-43, 528 N.W.2d at 490-91; *Heil Co. v. Hartford Acc. and Indem. Co.,* 937 F. Supp. 1355, 1361 (E.D. Wis. 1996); *Bradley Corp. v. Zurich Ins. Co.,* 984 F. Supp. 1193, 1199 (E.D. Wis. 1997). However, each of these cases is distinguishable because the policies at issues used legal terms of art that arguably have little meaning outside litigation, such as "slander," "misappropriation" and "malicious prosecution." *See Atlantic Mutual*, 191 Wis. 2d at 239, 528 N.W.2d at 490 (defining word "misappropriation" in policy using case law but

defining word "advertising" in same policy using general dictionary because "'advertising' is a non-technical word that should be given its ordinary meaning"). It does not appear that the plaintiffs in *Atlantic Mutual*, *Heil* or *Bradley* raised an argument that the terms in the policies could be defined more broadly than their legal definitions would allow.

Defendant is correct that its duty to defend was not triggered simply because Jay Link's complaint was "rife" with allegations regarding wrongful termination. The question is not just whether allegations in the complaint touch on a covered matter, but whether a particular *claim* is covered. Although a court must focus on the facts alleged in a complaint, those allegations must state a claim under *some* theory of liability. There is no support in the case law for an argument that stray allegations in the complaint trigger the duty to defend. *E.g.*, *Nichols v. Am. Employers Ins. Co.*, 140 Wis. 2d 743, 748-51, 412 N.W.2d 547, 550-51 (Ct. App. 1987) (claim for sexual harassment is not covered by policy that provides coverage for defamation, even if complaint were to allege defamatory statement).

In the instant case, Jay clearly premised his counterclaims on his contention that he was wrongfully terminated, at least with respect to his claim for breach of fiduciary duty, which he alleges was brought about in part because plaintiffs "[i]nsist[ed] on Jay's termination from the Link Family Enterprise" and "[r]efus[ed] to consider Jay's counterproposal that would permit him to remain an officer in the Link Family Enterprise."[4]  Defendant does not argue that Jay's allegations failed to state a claim for breach of fiduciary duty under those allegations.

---

[4]  Because the duty to defend is triggered if even one claim in a suit is covered by the policy, *School District of Shorewood v. Wausau Ins. Cos.*, 170 Wis. 2d 347, 488 N.W.2d 82, 88 (1992), I need not consider whether other counterclaims might have required defendant to represent plaintiffs.

Accordingly, I conclude as a matter of law that defendant breached its duty to defend plaintiffs.  Plaintiffs are entitled to summary judgment on this claim.

## II.  Duty to Indemnify: Prior Knowledge Provision

Defendant's fallback position is that even if it breached its duty to defend, it is not required to indemnify plaintiffs for any losses flowing from Jay Link's counterclaims because plaintiffs failed to disclose facts about their dispute with Jay when they applied for insurance in May and June 2005.  In particular, it points to plaintiff's answer of "none" in response to the provision (set out above at 8-9) asking whether plaintiffs were aware of anything that would give plaintiffs reason to suppose might give rise to a claim under the new policy.  Defendant asserts that plaintiffs were aware in June 2005 of facts that "might give rise to any claim that would fall within the scope of any of the proposed coverages" and that Jay's counterclaims arose from these known facts.

Plaintiffs do not challenge the validity of this provision but argue that: (1) defendant is estopped from disputing coverage because it breached its duty to defend; and (2) defendant has failed to adduce evidence that plaintiffs or Jay Link were aware that Jay might sue plaintiffs under a covered claim.  I address each contention in turn:

### (A) Estoppel

In support of their estoppel argument, plaintiffs cite a string of cases from the Wisconsin Court of Appeals in which the courts state unequivocally that an insurance company may not dispute coverage if it refuses to defend an insured and a court later finds that the duty to defend was breached. *E.g.*, *U.S. Fire Ins. Co. v. Good Humor Corp.*, 173 Wis. 2d 804, 818, 496 N.W.2d

23

730, 734 (Ct. App. 1993) ("When the insurer breaches its duty to defend its insured, it waives

any later challenge regarding its duty to indemnify."); *Grube v. Daun*, 173 Wis. 2d 30, 496

N.W.2d 106, 123 (Ct. App. 1992) ("Rather than raising the issue in court, an insurer cannot

deliberately reach its own conclusion on coverage and then maintain that a clause in the policy

would have excused it from indemnifying had the coverage issue correctly been decided by a

court originally."); *Professional Office Bldgs., Inc. v. Royal Indem. Co.*, 145 Wis. 2d 573, 586, 427

N.W.2d 427, 432 (Ct. App. 1988) ("We conclude, therefore, that Royal, having breached its

duty to defend the Mississippi action, may not now challenge or otherwise litigate the coverage

issues.").  This court reached the same conclusion several years earlier in *American Motorists Ins.*

*Co. v. Trane Co.*, 544 F. Supp. 669, 689 (W.D. Wis. 1982) (Crabb, J.).

In *Newhouse by Skow v. Citizens Security Mutual Ins. Co.*, 176 Wis. 2d 824, 501 N.W.2d

(1993), the Wisconsin Supreme Court seemed to ratify this approach (although without

discussing or even acknowledging the court of appeals cases) when it stated,

> We conclude that when an insurance company fails to follow the
> proper procedure of requesting a bifurcated trial on the issues of
> coverage and liability and [a] judgment is rendered against the
> insured before the coverage issue is finally determined, the . . .
> judgment is a natural and proximate cause of the insurance
> company's breach of its duty to defend for which it is liable.

176 Wis.2d at 838-39.

The reasoning for these cases is that an insurance company should be encouraged to seek a

declaration on its duty to defend *before* liability is determined for the purpose of judicial economy

and to prevent the policy holder from being left in the lurch unnecessarily.

On the other side, defendant cites *Hamlin Inc. v. Hartford Acc. and Indem. Co.*, 86 F.3d 93, 94 (7th Cir. 1996) (Posner, J.), in which the Court of Appeals for the Seventh Circuit questioned the validity of these holdings (and the Seventh Circuit's own acceptance of this rule in *Carney v. Village of Darien*, 60 F.3d 1273, 1277 (7th Cir. 1995)), stating that the estoppel rule provides a windfall to the insured, which would be appropriate only if the insurer's conduct met the standard for punitive damages. Judge Posner recognized that the Wisconsin Court of Appeals had applied estoppel in past cases, but he stated that *Newhouse* was the only supreme court case to address the subject and he characterized the discussion in *Newhouse* as dicta.

However, as plaintiffs point out, the discussion in *Hamlin* was itself dicta because the court concluded that the insurance company had *not* breached its duty to defend in that case. In *Radke v. Fireman's Fund Ins. Co.*, 217 Wis. 2d 39, 48, 577 N.W.2d 366, 371 (Ct. App.1998), the state court of appeals addressed *Hamlin* and concluded that it applies, if at all, in a case that "involve[s] multiple insurers" in which one refuses to help, but at least one "accept[s] the tender of defense." The court then reaffirmed its commitment to the estoppel rule:

> Wisconsin law is clear. When an insurer wrongfully refuses to defend on the grounds that a claim against its insured is not within the coverage of the policy, the insurer cannot later contest coverage, but is liable to the insured.

217 Wis.2d at 48.

Judge Posner now seems resigned to Wisconsin's position, grousing last year that "Wisconsin may be one of these states" that "go so far as to estop the insurer to deny coverage if he breaches his duty to defend . . . so that the insured prevails even if he could not have established coverage had he had the world's best lawyer." *Guaranty Bank v. Chubb Corp.*, 538 F.3d 587, 592 (7th Cir. 2008).

The Wisconsin Supreme Court recently declined an opportunity to provide further guidance in *Liebovich v. Minnesota Ins. Co.*, 2008 WI 75, 310 Wis. 2d 751, 784, 751 N.W.2d 764, 779-80 (2008). Instead, the court stated only that a "unilateral refusal to defend without first attempting to seek judicial support for that refusal *can* . . . estop insurers from being able to further challenge coverage." *Id.* at ¶ 55 (emphasis added). It did not address the tension on this issue between the state and federal courts of appeal or elaborate on the circumstances under which estoppel applies.

In the absence of a  clear ruling from the Wisconsin Supreme Court or the Seventh Circuit, I will stick with this court's decision in *American Motorists* and the conclusions in the many Wisconsin Court of Appeals decisions: estoppel is appropriate when an insurer breaches its duty to defend. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir.1999) ("Where the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently."). Ultimately, however, this choice may lose its urgency because I also find that defendant has not shown that plaintiffs failed to disclose required information on their application for insurance.

**(B) Plaintiffs' Duty To Disclose**

When determining whether an insured violated its duty to disclose, courts may use either a subjective test (what the insured actually knew or believed) or an objective test (what a hypothetical reasonable person would be held to have known under the circumstances). In its opening brief, defendant argues for an objective test, citing *Evanston Ins. Co. v. Security Assur. Co.*,

26

715 F. Supp. 1405, 1414 (N.D. Ill. 1989), and *International Surplus Lines Ins. Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 903-04 (10th Cir. 1995), in which the courts concluded that an objective test was appropriate in assessing the application of a provision that required the insured to disclose facts if it had "reason to suppose" those facts "might" give rise to a covered claim.  Use of the phrase "reason to suppose" meant that courts should look at what a hypothetical objectively reasonable applicant would have supposed based on the facts known it, rather than what the applicant now is claiming to have known or believed.  *Evanston Ins. Co.*, 715 F.Supp. at 1414 (applying Illinois law); *International Surplus*, 52. F3d. at 903-04 (applying Wyoming law and citing to *Evanston Ins. Co.*)

        Plaintiffs suggest that a subjective standard may be more appropriate, citing *Estate of Logan by Fink v. Northwestern Nat. Cas. Co.*, 144 Wis. 2d 318, 338, 424 N.W.2d 179, 185-86 (1988), in which the court applied a subjective test to a provision in a professional liability policy that excluded acts that occurred before the inception of the policy unless "the Insured had no basis to believe that the Insured had breached a professional duty."  The court held that the operative question in determining whether the insured had a "basis to believe" was whether the insured knew or believed, prior to the effective date of the policy, that he had breached a professional duty.  144 Wis.2d at 339.  The court provided a hypothetical example to support its conclusion that imposing an objective standard would be contrary to the purpose of professional liability insurance, inconsistent with what an insured would have understood the exception to provide, and palpably illogical in application.  *Id.* at 338-39.

Defendant does not address the issue in its reply brief, perhaps tacitly conceding that *Estate of Logan* controls.[5]  As a practical matter, although the subjective test is more forgiving of an applicant (and probably truer to the parties' intent, as demonstrated by the example in *Estate of Logan*) it is not an automatic winner for the applicant. For instance, if there was conflicting admissible evidence about what the insured actually knew at the time it submitted its policy, then the court could not simply accept the insured's self-serving assertion of ignorance.  Also, it may be that in many cases, the court would reach the same result regardless which test it uses.

That appears to be the case here. Even under the objective standard–and contrary to defendant's suggestion–the policy's use of the word "might" did not require plaintiffs to speculate as to the myriad ways that facts held in the corporate knowledge might lead to a lawsuit, no matter how remote the odds. An applicant for an insurance policy cannot be expected to be a fortune teller.  Regardless of the apparent breadth of such a provision, an insurer can only require an applicant to disclose a possibility that is reasonably foreseeable.  *See, e.g.*, *International Surplus*, 52 F.3d at 904 (discussing what a "reasonable person" would know); *Evanston Ins. Co.*, 715 F. Supp. at 1414 (question is whether plaintiff "could have reasonably foreseen that a claim would be made against" it).

In arguing that plaintiffs should have known that a claim was coming from Jay Link, defendant points out that when plaintiffs applied for an insurance policy with defendant, this internecine battle had been raging for several years and seemed to be heating up.  In addition, plaintiffs had retained lawyers who were drafting documents labeled as "Attorney Work

---

[5]  Defendant raises this issue regarding the prior knowledge provision solely in its own motion for summary judgment; neither side raises this issue in their briefs on plaintiffs' motion for summary judgment.

Product" (although they dealt with a strategy for buying out Jay, not suing him).  If the operative question on the insurance application had been whether plaintiffs were aware of any situation that gave them reason to suppose might give rise to a *lawsuit*, then plaintiffs' failure to disclose their dispute with Jay Link at best would have been laughably naive, at worst borderline fraud.  But this wasn't the operative question.  The operative question asked if plaintiffs were aware of any situation which they had reason to suppose might give rise to a *covered claim*.  That question is different enough to lead, objectively, to a different answer.

Defendant has failed to show that Jay Link's allegations of wrongful termination were reasonably foreseeable in June 2005.  By then, plaintiffs and Jay Link had been at odds for several years, including a full year of open hostility, yet no one had filed or seriously threatened to file a lawsuit.  Jay was constantly threatening plaintiffs, but these were threats to *leave* the company of his own accord.  Certainly, by May and June 2005, some of the plaintiffs were communicating to Jay that they believed he *should* leave, but the written communications show plaintiffs' to be proposing a bargained-for transition rather than commanding Jay to leave.  There is no evidence in the record undermining these characterizations in the letters and memos.  There is no evidence in the record showing that prior to June 2005 Jay communicated a belief that plaintiffs were forcing him out of his job.  This is in stark contrast to the situation in *International Surplus Lines Insurance*, 52 F.3d at 904, and *Evanston Insurance*, 715 F. Supp. at 1415, in which the insureds were explicitly threatened with lawsuits on matters that fell within proposed coverage. Defendant points to no facts suggesting that Jay was going to sue plaintiffs at all, much less that he would bring any claims premised on a belief that he was wrongfully terminated.

Perhaps realizing the weakness of its position, defendant adds to its reply brief an argument that plaintiffs should have disclosed facts underlying their *own* plans to sue Jay Link for breach of fiduciary duty.  As a starting point, reply briefs are not the place to raise new arguments.  *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.")

In any event, this argument is based on a sequence of undeveloped premises: first, that the defendants' questionnaire required plaintiffs to disclose the possibility that *they* might file a lawsuit against Jay Link in which they intended to assert claims indisputably *not* related to covered occurrences (here, Jay's claimed breach of fiduciary duty); second, that plaintiffs reasonably might have supposed that Jay's response to this lawsuit would include a counterclaim that *did* fall within the scope of any of the proposed coverages (here, wrongful termination, which was the only type of claim not covered by the "insured versus insured" exclusion), and third, that Jay's counterclaim "ar[ose] from" the same "fact, circumstance, or situation" as plaintiffs' own claim against Jay (which is not the same as having been provoked by the fact of plaintiffs' lawsuit).  Although one might be able to contrive colorable arguments in favor of each of these premises, particularly with the benefit of hindsight, they are anything but self-evident from the language of the policy or the undisputed facts.  I cannot consider such an undeveloped argument, particularly when plaintiffs did not have a chance to respond to it.  *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1006 (7th Cir. 2008).

Thus, even if I were to assume that defendant is not estopped from challenging coverage and further assume that defendant does not have to prove that plaintiffs were actually aware

that a covered claim was likely to be filed against them,[6] defendant has failed to show it is entitled to deny coverage to plaintiffs on the ground that plaintiffs failed to disclose required information in their application.  Because defendant raises no other objections to coverage, plaintiffs' motion for summary judgment must be granted in full.


ORDER

It is ORDERED that:

(1)  The motion for summary judgment filed by defendant Federal Insurance Company, dkt. 41, is DENIED;

(2)  The motion for summary judgment filed by plaintiffs Link Snacks, Inc., L.S.I., Inc.-New Glarus, Link Snacks Global, Inc., Northern Air Services, Inc., Link Holdings, Inc., John E. Link, Troy J. Link, John Hermeier, Lawrence J. Jarvela and Michael McDonald, dkt. 46, is GRANTED; and

(3)  The bench trial on January 18, 2010 will proceed on the question of damages.


Entered this 20th day of October, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

---

[6]  For completeness's sake, I note plaintiffs prevail under subjective test because there is no evidence that plaintiffs knew in May or June 2005 that they faced any risk of a wrongful termination lawsuit from Jay.

31